UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

PEGGY JO SMITH individually and on behalf )
of similarly situated individuals,            )
                                              )
                          Plaintiff,          )
                                              )
              v.                              )          3:13-cv-00221-RLY-MPB
                                              )
PROFESSIONAL TRANSPORTATION                   )
INC., and                                     )
RONALD D. ROMAIN individually and as          )
president and secretary of Professional       )
Transportation, Inc.,                         )
                                              )
                          Defendants.         )

**ORDER ON DEFENDANTS'
MOTION TO DECERTIFY COLLECTIVE ACTION**

In this action, Plaintiff Peggy Jo Smith ("Smith"), individually and on behalf of

similarly situated individuals, alleges that Defendants, Professional Transportation Inc.,

and Ronald D. Romain (collectively, "PTI"), violated the Fair Labor Standards Act

("FLSA") when they failed to pay Branch Administrators overtime compensation or

when they failed to classify Branch Administrators as exempt and pay them as prescribed

by the Act. The parties stipulated to the conditional certification of the following class

under Section 16(b) of the FLSA, 29 U.S.C. § 216(b):

> All individuals who were employed or are currently employed by PTI as a
> Branch Administrator at any time between November 10, 2011, and
> January 9, 2015. [1]

---

[1] The parties' stipulation included a proposed Order, as well as a proposed Class Notice and
Consent to Opt In Form. (Filing Nos. 80-1, 80-2 & 80-3). But, the court never issued the
proposed Order. *See*, *generally*, Docket. The court did reference the parties' stipulation,

(Filing No. 80, at p. 3). PTI has moved to decertify this conditional class arguing that Smith cannot show that any common policy or practice violates the FLSA. (Filing No. 209; Filing No. 217). The court, having reviewed the parties' briefs, their designated evidence, and the applicable law, now finds that PTI's motion to decertify the collective class should be **GRANTED**.

## I. Factual Background

### A. PTI's Field Management Structure

PTI provides over-the-road ("OTR") and dedicated yard van ("DYV") crew transportation services to customers in the railroad industry. (Filing No. 210-2, Baum Decl. ¶¶ 5-7). PTI has 225 different branches in 36 states. Fifty-five of these branches are formal offices, but the remaining branches operate in various settings, including in branch managers' homes. (*Id.* ¶¶ 6-10). The communities in which PTI operates its branch offices also vary, ranging from rural and remote towns to major cities and metropolitan regions. (*Id.* ¶ 13).

Before 2011, PTI's field offices included OTR drivers, DYV drivers, multi-purpose vehicle ("MPV") drivers, and branch managers. (*Id.* ¶ 16). PTI used "branch manager" as a generic term that referred to all individuals who had managerial duties associated with a branch. (*Id.*). Some branch managers were paid on a salary basis of

---

however, in its Order granting Smith's Third Motion to Facilitate and Expedite Section 216(b) Notice. (Filing No. 90 at p. 1). It appears that the parties have treated this reference as the court's acceptance of their stipulation to the conditional certification of the collective class. Because discovery has closed, the court will treat the motion decided herein as one to decertify a conditionally collective class as stipulated to by the parties and make clear whether or not a class is certified in this Order.

more than $455.00 per week, while some were paid for a set number of management hours for a set dollar amount less than $455.00 per week.  (*Id.*).

In or around early 2011, PTI began to refine its field management operations.  (*Id.* ¶ 17).  Those branch managers who spent the majority of their time performing managerial functions at the branch were given the formal title "Branch Manager," and were treated as exempt from overtime. (*Id.*).  Some branch managers who had less extensive managerial functions were given the formal title "Branch Administrator," and were treated as non-exempt from overtime.  (*Id.*).  The Branch Administrators were required to report all managerial function hours and to be paid for all such hours. (*Id.*).

The transition to this new system occurred piecemeal throughout 2011, with most positions being reclassified by July 2011.  (*Id.* ¶ 18).  Following this reorganization, which was completed on November 1, 2011, all of PTI's Branch Managers have been classified as exempt and have been paid at least $455.00 per week.  (*Id.* ¶ 19).

Also since November 1, 2011, PTI has used the code "BA" to denote time that non-exempt managers, like Branch Administrators, spend on their managerial responsibilities.  (*Id.* ¶ 22).  Non-exempt managers are also paid hourly for their non-managerial duties, which could include driving, wait time while driving, or other non-managerial tasks.  (*Id.*).

The type and number of managers at each PTI branch office varies depending on these factors:  (1) the number of employees and vehicles assigned to the branch; (2) the railroad customer primarily served out of the branch; (3) the routes and geographic region that are covered by the branch; and (4) the type of services the branch primarily provides.

(*Id.* ¶ 15).  Branch offices may be staffed by one or more of the following:  Branch Managers, Assistant Branch Managers, Branch Administrators, and Assistant Branch Administrators.  (*Id.* ¶¶ 21, 23-26).

Branch Managers and Branch Administrators are responsible for the day-to-day operations of a branch, which includes, but is not limited to, safety, staffing, on-time performance, and customer relationship management.  (*Id.* ¶¶ 21 & 23).  Branch Administrators may or may not have the ability to hire and fire employees.  (*Id.* ¶ 23).  Generally, in the larger branches that have a Branch Manager, the Branch Administrator does not have the authority to hire and fire.  (*Id.*).  However, in smaller branches that do not have a Branch Manager, a Branch Administrator typically would have the authority to hire and fire employees.  (*Id.*).  With the exception of Branch Managers, all other managers have OTR and/or DYV driving responsibilities in addition to their managerial responsibilities.  (*Id.* ¶¶ 21, 23-26).

Forty-five PTI branches have a dedicated Branch Manager who is responsible for only the one branch.  (*Id.* ¶ 26).  Fifty-three PTI branches share a Branch Manager.  (*Id.*).  Thirty-three PTI branches have an Assistant Branch Manager, some of whom assist multiple branches.  (*Id.*).  Eleven PTI branches have a Branch Administrator, but no Branch Manager; and some Branch Administrators have responsibility for multiple branches.  (*Id.*).  Although there has been such a structure in the past, no branches had both a Branch Administrator and an Assistant Branch Administrator as of the date PTI filed its brief.  (*Id.*).

Larger PTI branches may have additional management and administrative employees, including but not limited to, Fleet Managers, Night Managers, and Administrative Assistants.  (*Id.* ¶ 27).  At the time PTI filed its brief, it employed two Fleet Managers, one Administrative Assistant, and one Branch Assistant.  (*Id.*).  Fleet Managers are responsible for maintaining and coordinating the day-to-day field fleet operations.  (*Id.* ¶ 28).  Some branches also employ Lead Drivers who are primarily responsible for OTR and DYV driving, but are also given some administrative responsibility for day-to-day operations.  (*Id.* ¶ 29).

### B. Compensation Structure for Non-Exempt Managers

Generally, PTI wants its non-exempt managers to work 40 hours per week and to limit overtime whenever possible.  (*Id.* ¶ 32).  Since November 1, 2011, as a way to budget and control costs, PTI has required non-exempt field managers to execute Branch Administrator agreements ("BA Agreements").  (*Id.* ¶ 31).  The BA Agreements represent PTI's initial estimate as to the number of hours necessary for a non-exempt manager to complete his or her managerial or administrative functions.  (*Id.* ¶ 32).  The remainder of a non-exempt manager's 40-hour week is spent performing driving duties.  (*Id.*)  Non-exempt managers are paid extra for performing OTR and DYV driving duties.  (*Id.* ¶ 44).

A General Manager[2] will determine the number of hours in a BA Agreement based on a number of variables, including, but not limited to:  (a) the number of vans and drivers at the branch(es) the Branch Administrator serves; (b) past experience of the managers at the branch(es); and (c) the position at issue.  (*Id.* ¶ 33).  Not only will the number of hours vary, but the rates of pay also vary by branch and position.  (*Id.*).  This is evidenced by the variety of hour and pay rates for opt-in Branch Administrators ("Opt-In Plaintiffs").  (*Id.*  ¶ 39 (summarizing the hours and pay for Terry Lucas (10 hours of administrative time at the rate of $175 per week), Mark Furness (12 hours of administrative time at the rate of $200 per week), Harold Jones (16 hours of administrative time at the rate of $325 per week), David Jameson (25 hours of administrative time at the rate of $375 per week), and Gloria Heard ($36 hours of administrative time at the rate of $371.16 per week)).

PTI periodically revises individual BA Agreements to reflect a Branch Administrator's need for more or less time to complete his or her administrative functions.  (*Id.* ¶¶ 38, 43 (providing examples of revisions made to the BA Agreement for Robin Ahrens)).  BA Agreement revisions are made on a case-by-case basis by General Managers, in consultation with Regional Managers and Directors.[3]  (*Id.* ¶ 38).

---

[2] It appears from the declaration of Sherry Linkous, discussed later in this Order, that General Managers are superior to both Branch Managers and Branch Administrators.  (Filing No. 210-5, Linkous Decl. ¶ 7).

[3] The parties provide no information regarding the authority of a Regional Manager or a Director and how each fits into the PTI branch structure; however, the court will presume that the authority given to such persons are superior to General Managers, Branch Managers and Branch Administrators.

Non-exempt managers must seek pre-approval from their General Manager for any administrative hours worked in excess of the hours allotted in their BA Agreements. (*Id.* ¶ 34). In 2012, PTI published two forms to all branches (at the local, dedicated email address), General Managers, Regional Managers, and Directors. (*Id.* ¶ 35). A Branch Administrator was to use the Branch Administrator Over Agreement Approval Form ("Approval Form"), to keep track of his or her time and to submit this form to his or her General Manager or Regional Manager (whichever he or she reported to) before exceeding the hours approved in his or her BA Agreement. (*Id.* ¶ 35a.). A Branch Administrator was instructed to use the Branch Administrator Time Report ("Time Report") to record his or her time on a weekly basis and submit the Time Report to PTI's payroll department in Evansville, Indiana. (*Id.* ¶ 35b.). Further, in a November 26, 2012, email from Steve Greulich, PTI's Human Resources Director, Branch Administrators were told:

> If a Branch Administrator does not seek preapproval of extra time and submits extra time, the time will be paid. However, Branch Administrators may be subject to the discipline process should this occur. If a Branch Administrator feels he/she can not [sic] perform the job without exceeding approved hours, he or she should discuss this with his/her manager.

(*Id.* ¶ 36).

General Managers and/or Regional Managers are responsible for ensuring that Branch Administrators follow PTI policies, including the one for preapproval of extra time. (Filing No. 210-3, Barr Decl. ¶¶ 14-15). Non-exempt managers who submitted Time Reports with excess Branch Administrator hours who had not obtained prior approval for such hours were subject to counseling and discipline for failure to follow

PTI's policies.  (*Id.* ¶ 15).  PTI's payroll department paid non-exempt managers for all time submitted on their Time Reports, regardless of whether or not those hours had been preapproved.  (*Id.*).

### C.  Training on Pay for Non-Exempt Managers at PTI

Since October 2012, Tammi Hinkley, PTI's corporate trainer, has trained field management on a variety of topics, including but not limited to, payroll issues.  (Filing No. 210-4, Hinkley Decl. ¶¶ 5-7).  In 2012 and 2013, Hinkley developed the Branch Manager Training Program ("BMTP"), a comprehensive one-week training program, which is required for all newly-hired or newly-promoted General Managers and Branch Managers.  (*Id.* ¶¶ 8-9).  The BMTP replaced PTI's former model for training field managers, which relied upon General Managers to develop their own training practices and techniques using the Branch Manager's Manual as a guide.  (*Id.*¶ 12).  Prior to implementation of the BMTP, training conducted by General Managers was inconsistent. (*Id.*).

Assistant Branch Managers and Branch Administrators, as well as all other non-exempt field managers, are encouraged, but not required, to complete the BMTP.  (*Id.* ¶ 9).  The BMTP includes training regarding submission of Time Reports and directs managers to submit those reports to PTI's payroll department.  (*Id.* ¶ 10).  During the BMTP, Hinkley specifically instructs those who attend that non-exempt field managers are to be paid for all time worked, including for participation in BMTP training.  (*Id.*).

Hinkley's training records reflect that fifteen Opt-In Plaintiffs participated in the BMTP and received training regarding payroll issues for non-exempt managers and

submission of Time Reports; the remaining plaintiffs were not trained by Hinkley.  (*Id.* ¶ 13).  Further, Hinkley trained fifteen General Managers who supervised Opt-In Plaintiffs. (*Id.* ¶ 14).  Again, this training included payroll issues for non-exempt managers and the submission of Time Reports.  (*Id.* ¶ 10).

### D.  Plaintiffs' Background, Work History & Terms of Employment[4]

#### 1.  Named Plaintiff Peggy Jo Smith

Named plaintiff Peggy Jo Smith began her employment with PTI on or about November 18, 2011, as an OTR driver.  (Filing No. 210-2, Baum Decl. ¶ 45).  In that role, Smith was classified as non-exempt and was paid for all hours worked, including overtime.  (*Id.*).

On or about February 22, 2013, Smith was promoted to Branch Administrator. (*Id.* ¶ 46).  She was Branch Administrator for three branches, the Weller branch, located in Grundy, Virginia; the Richlands branch, located in Richlands, Virginia; and the Dismal branch, located between Grundy and Richlands.  (Filing No. 210-6, Smith Dep. at 12).

---

[4] Smith raises a hearsay objection to paragraphs 9 and 10 in the declaration of Sherry Linkous, which was proffered by PTI, in part, for certain statements made by former General Manager, Briggette Ashburn, who supervised Smith and Opt-In Plaintiff James Coffey.  (Filing No. 220 at pp. 9-13 (Plaintiff's objection); Filing No. 210-5 (Linkous Decl.)).  After reviewing the declaration, the court SUSTAINS the objection regarding Linkous' statements about what Ashburn said, and those statements will not be considered.  *See* Fed. R. Evid. 801.  However, factual statements proffered by PTI contained in the declaration may be used.

Further, Smith objects to many of the exhibits attached to various declarations and to submission of entire transcripts rather than select pages.  (Filing No. 220 at 6-9).  These objections are SUSTAINED to the extent that the court will not hunt for truffles buried in the exhibits, but it is OVERRULED to the extent that Smith seeks to strike all of the exhibits wholesale; rather the court will consider all properly cited materials.

Smith voluntarily resigned her employment on or about August 20, 2013.  (Filing No.

210-2, Baum Decl. ¶ 46).

Smith testified that she entered into a BA Agreement in February 2013.  (Filing

No. 210-6, Smith Dep. at p. 11; Filing No. 210-7 at p. 2[5]).  Her BA Agreement provided

that she was authorized to perform 22 hours per week of administrative duties and would

be paid $375.00 per week for such duties.  (Filing No. 210-7 at p. 2).  It further provided

that "[a]ny administrative time over 22 hours/week must be pre-approved by [her]

General Manager."  (*Id.*).  Smith was also expected to drive and would be compensated

for that work "at the Level 5 negotiated rate."  (*Id.*).

From February 14, through February 20, 2013, Smith participated in a BMTP in

Evansville, Indiana.  (Filing No. 210-4, Hinkley Decl. ¶ 15).  There, Smith received 59

hours of training on a number of topics related to her responsibilities as a Branch

Administrator, including the requirement that she submit weekly Time Reports and report

all hours worked.  (*Id.*).

As a Branch Administrator, Smith was classified as non-exempt and was paid for

all hours worked, as she reported it to PTI, including overtime of any type.  (Filing No.

210-2, Baum Decl. ¶ 46).  However, Smith testified that she performed administrative

work more than 22 hours per week on a regular basis.  (Filing No. 210-6, Smith Dep. at

p. 14).  She claims that she never asked her Branch Manager, Briggette Ashburn, to

---

[5] To streamline this Order, citations to the parties' briefs will be to the ECF page number in the
upper, right hand corner of the document and should be presumed to include the material cited
therein.

approve any additional hours over the 22 hours per week authorized for administrative work in her BA Agreement.  (*Id.*).  Smith admitted that she was provided a form to report her excess Branch Administrator hours, but Smith claimed that Ashburn implied that she should not use it.  (*Id.* at p. 15).  Smith explained, "I was told I could fill [the form] out, but I probably wouldn't get paid for it.  And I knew that when the previous manager had filled it out and got paid for it, they got rid of him."  (*Id.* at p. 154).   Smith asserted that she never reported hours of 40 or more in a week to PTI to receive overtime pay for any type of work.  (*Id.* at pp. 40, 86).  Smith testified that she does not know if other Branch Administrators had the same experience with their pay; she just knew that "there was somebody that turned in overtime pay, and he was dismissed because of that."  (*Id.* at pp. 41, 51, 66-67).  Smith stated that she learned about that incident from Ashburn.  (*Id.* at pp. 66-67).

Sherry Linkous, who has been employed by PTI since November 2011, has acted as both an Assistant Branch Manager, and a Branch Manager; Linkous reported to General Manager Ashburn in both roles.  (Filing No. 210-5, Linkous Decl. ¶¶ 3-5).  In addition to Linkous and Smith, Opt-In Plaintiff James Coffey also reported to Ashburn when he was a Branch Administrator.  (*Id.* ¶ 7).  Ashburn held weekly calls with all of the managers who reported to her, including Branch Managers, Assistant Branch Managers, and Branch Administrators, among others.  (*Id.*).  Linkous remembers Ashburn discussing payroll topics during those weekly meetings.  (*Id.* ¶ 8).  She also recalls that Smith and Coffey attended weekly calls during their employment with PTI as Branch Administrators.  (*Id.* ¶ 7).  Linkous believed Smith was not a hard worker

apparently because Linkous was asked to perform tasks for the Weller and Richlands branches that should have been done by Smith.  (*Id.* ¶ 11).

### 2.  Opt-In Plaintiff James Coffey

Opt-In Plaintiff James Coffey was Smith's immediate predecessor as the Branch Administrator responsible for PTI branches in Richlands, Weller and Dismal.  (Filing No. 210-7, Smith Dep. at p. 59).  Coffey was a Branch Administrator from approximately July 2012, until his employment was terminated in January 2013.  (Filing No. 210-10, Coffey Dep. at p. 10).  Upon his employment, Coffey entered into a BA Agreement under which he received $375 per week to perform administrative functions and was authorized to perform those functions up to 22 hours per week.  (*Id.* at pp. 14-15).

When he first started his employment as a Branch Administrator, Coffey did not track the number of hours he spent doing Branch Administrator work. (Filing No. 217 at p. 22).  Within two or three months, Coffey received an email notifying him of the new policy that required him to report his time.  (*Id.*).  Coffey double-checked this requirement with Ashburn, who told him to tell the truth about how much time he spent performing Branch Administrator work.  (*Id.*).  Coffey started to keep a daily log of his time, which he sent in with his Time Report, because he thought payroll and/or management would not believe the amount of time he spent doing Branch Administrator work.  (*Id.*).  Coffey testified that PTI paid him for all of the time he submitted, which he described variously as "overtime, extra time."  (*Id.* at pp. 22-23).  Coffey estimated that he spent between 60 and 90 hours a week on his Branch Administrator duties, in part, because of the unique geography of his assigned branches.  (*Id.* at p. 23).  Coffey testified

12

that PTI may not have considered driving time between the three branches when they estimated that his Branch Administrator hours should be limited to 22 per week. (*Id.* at p. 23. *See also* Filing No. 220 at pp.14-16 (discussing Coffey's testimony regarding his experience as a Branch Administrator at PTI, including his Time Records for 24 weeks that show excess hours submitted for only weeks 6 through 11)).

Coffey's time records indicate that beginning in October 2012, he reported working up to 106 hours per week and was paid for all of that time, including overtime. (Filing No. 217 at p. 24). After several pay periods submitting times substantially in excess of the 22 hours authorized by his BA Agreement, Coffey testified that he participated in a conference call with "Earl" and Danny Barr, who worked in PTI's corporate office, during which Barr implied that Coffey had falsified his time. (*Id.* at pp. 24-25). A couple of days later, Earl conducted another telephonic conference that included Coffey, Ashburn, and other Branch Administrators. (*Id.* at p. 25). Coffey perceived that Earl was implying that Coffey was inefficient and that Earl refused to recognize the complication of having three sites that were far apart. (*Id.*). Coffey testified that, after this call, he was directed to stop sitting through twelve to fourteen hours of training each week with new drivers to reduce his Branch Administrator time. (*Id.*). In addition, Coffey stated that PTI also changed its policy to require that Branch Administrators seek pre-approval for time spent on managerial work in excess of that authorized by his or her BA Agreement. (*Id.* at p. 24). Further, after the calls with Earl and the one with Barr, Coffey was told to submit his Time Reports to Ashburn, rather than directly to payroll. (*Id.* at p. 25). He continued to report overtime for several weeks,

13

but he later stopped making such reports because he was not getting paid for it.  (*Id.*).
(*See also* Filing No. 220 at 15 (listing hours submitted by Coffey during 24 weeks as a
Branch Administrator)).  Coffey suspects that Ashburn failed to turn in these Time
Reports; however, no one from PTI told him to stop reporting his overtime for Branch
Administrator work, rather, he claimed he would report it to Ashburn and then "never
hear" about it.  (Filing No. 217 at p. 25).

In January 2013, Ashburn told Coffey that PTI was terminating his employment
because he had been speeding while driving a PTI van.  (*Id.*).  Coffey does not dispute
that he was speeding.  (*Id.*).  Coffey claims, however, that he was terminated for having
previously submitted excess hours.  (*Id.* at p. 26).

Coffey testified that he has had no communication with Smith for any reason.
(*Id.*).  Further, Coffey admits that he has no knowledge of other Branch Administrator's
experiences with pay at PTI and could not identify any generally applicable policy that
prohibited Branch Administrators from receiving pay for additional Branch
Administrator work or overtime.  (*Id.*).  Coffey claims that PTI stopped paying him for
additional Branch Administrator hours because Barr believed Coffey was falsifying his
Time Report.  (*Id.*).  Coffey claimed that although Barr never said that he would no
longer be paid overtime, that is what he thought Barr meant.  (*Id.*).  Barr denies telling
Coffey to stop reporting extra Branch Administrator time, or any other time, that he
worked.  (*Id.* at pp. 26-27).

### 3.  Opt-In Plaintiff Elizabeth Hires

From early 2012 through May 10, 2013, Opt-In Plaintiff Elizabeth Hires worked

as an Assistant Branch Manager, in Waycross, Georgia, and received pay as a Branch

Administrator.  (Filing No. 210-2, Baum Decl. ¶ 54).  Hires testified that her BA

Agreement authorized her to work 20 hours per week on administrative tasks and to

submit Time Reports.  (Filing No. 210-18, Hires Dep. at pp. 43-44).  Hires further stated

that, in early 2012, when she submitted time over the 20 hours authorized in her BA

Agreement, PTI refused to pay it.  (*Id.* at pp. 44-45).  Subsequently, she decided to limit

the time she reported for administrative work to 20 hours because PTI would not pay her

for any more hours than that.  (*Id.* at p. 45).  Hires also testified that she spent an

additional four hours per day taking phone calls that she never reported to PTI.  (*Id.* at pp.

91-92).  She claimed that she was responsible for fielding calls at night because the

Branch Manager with whom she worked refused to take them.  (*Id.* at pp. 103-04).  Hires

testified that she rarely slept through the night because she fielded so many calls.  (*Id.*).

(*See also* Filing No. 220 at pp. 17-18 (discussing Hires' decision to stop reporting all of

her Branch Administrator hours)).

Hires admitted that she signed a release in 2013 after she participated in a prior

lawsuit, *Matthews v. Professional Transportation, Inc.*, 3:11-cv-00097-RLY-WGH (S.D.

Ind.); and she received a settlement payment in that case.  (*Id.* at p. 94; Filing No. 210-19,

*Matthews* Order Approving Settlement, at pp. 26-28).  However, in that case, Hires

released only claims she may have against PTI relating to her work as an OTR driver, not

for claims she may have as a Branch Administrator.  (Filing No. 210-19, *Matthews* Order Approving Settlement, at p. 25).

### 4.  Payroll Data

PTI's payroll data reflects that 109 of the 116 opt-in plaintiffs received Branch Administrator pay for the period between December 2011, and April 2016.  (Filing No. 210-2, Baum Decl. ¶ 52).  Forty-three of 109 Opt-In Plaintiffs, or 39%, had at least one week during that period in which they were paid for Branch Administrator hours in excess of those allowed by their respective BA Agreements.  (*Id.*).  Ninety-four of 109 Opt-In Plaintiffs, or 86%, had a least one week in which they were paid overtime.  (*Id.*).

For example, during the period between January 2014, and October 2015, Phillip LeClair, Jr., a Lead Driver in Wisconsin Rapids, Wisconsin, was paid for, on average, 24 Branch Administrator hours per week even though his BA Agreement authorized only 15 administrative hours per week.  (*Id.* ¶ 53).  Similarly, Pamela Murkerson, who worked as a Branch Administrator in Chattahoochee, Florida, between May 2014, and March 2016, was authorized to work up to 15 administrative hours per week; however, she reported and was paid for excess Branch Administrator hours in 95% of the weeks she worked in that role.  (*Id.*).  Further, Juan Perkins, an Assistant Fleet Manager in the Chicago East Branch, whose BA Agreement authorized him to work 30 hours a week on administrative duties, reported and was paid for excess Branch Administrator hours in 11% of the weeks between February 2012, and October 2015.  (*Id.*).

### 5.  Opt-In Plaintiffs' Other Data

Smith presented a chart of information regarding the duties of various Opt-In Plaintiffs and the number of hours each claims he or she worked on those duties.  (Filing No. 220 at pp. 19-26).  The Opt-In Plaintiffs described include: Debra Clayton, from Tallahassee, Florida; Hires (discussed above); George Lee, from Pittsburgh, Pennsylvania; Jared McNeley, from Denver, Colorado; Jon Steepleton, from Elkart, Indiana; Marcus Crawford, from Chicago East, Illinois; David Graves, from Chicago East, Illinois; Coffey (discussed above); Smith (discussed above); Oliver Reeves, from Bluefield, West Virginia; Jon Hamilton, from Charlotte, North Carolina; April Powers, from Pine Bluff/Camden, Arizona; Maria Bundy, from Salem, Illinois; Mack Smoot, from Columbia, South Carolina; and Richard Milling, from Meridian, Mississippi (collectively, "Opt-In Plaintiff Declarants").  (*Id.*).  Many of the duties described by the Opt-In Plaintiff Declarants are similar and track the job descriptions of a Branch Administrator and/or Branch Manager.  (*Id.* at pp. 19-26 & 19-20 ns.10 & 11).  All of them, save one (Oliver Reeves), declare that they performed these duties for more than 40 hours per week.  (*Id.* at pp. 19-26).  Further, 51 opt-in plaintiffs, either by declaration or in deposition testimony, claim that, "although [they] at times may have been paid for some overtime hours submitted, many were threatened with termination if they sought or complained about not receiving overtime compensation."  (*Id.* at p. 27).  In addition, 42 opt-in plaintiffs declare that their "immediate manager was aware of the number of hours [they were] working and that those hours were in excess of what PTI assigned [them] to accomplish [their] duties as Branch Administrator."  (*Id.* at pp. 27-28 (citing, e.g., Filing

17

No. 220-19, Aherns Decl. ¶ 6)).  Further, eight opt-in plaintiffs declare that they were not required to track the hours in which they performed work as a Branch Administrator.  (*Id.* at p. 28).

## II.    FLSA Collective Action

Generally, the FLSA proscribes the payment of wages to an employee that falls below minimum wage levels, 29 U.S.C. § 206; and the practice of requiring an employee to work more than 40 hours per week without receiving overtime compensation consistent with minimum requirements, 29 U.S.C. § 207.  The FLSA also sets standards for determining whether work is exempt from the requirements of the FLSA.  29 U.S.C. § 213.

"Under Section 216(b) of the FLSA, employees may bring a collective action on behalf of themselves and other 'similarly situated' employees against employers who violate the Act's minimum wage and overtime provisions."  *Smallwood v. Ill. Bell Tel. Co.*, 710 F. Supp. 2d 746, 750 (N.D. Ill. 2010) (quoting 29 U.S.C. § 216(b)).  The FLSA does not define the term "similarly situated," *Russell v. Ill. Bell Tele. Co.*, 721 F. Supp. 2d 804, 811 (N.D. Ill. 2010), and the Seventh Circuit has not set forth criteria for determining whether employees are "similarly situated" or how collective actions should proceed.  *Hundt v. Directsat USA, LLC*, 294 F.R.D. 101, 103 (N.D. Ill. 2013).  Therefore, courts in this circuit typically use a two-stage inquiry.  *See Hawkins v. Alorica, Inc.*, 287 F.R.D. 431, 438 (S.D. Ind. 2012).

The first stage, also known as the notice stage, requires a plaintiff "'to make a modest factual showing that [he or she] and the other employees to whom notice is to be

sent were victims of a common policy or plan that violated the law.'" *Streeter-Dougan v. Kirkston Mortgage Lending, LLC*, No. 3:13-cv-166-RLY-WGH, 2013 WL 6174936, at *1 (S.D. Ind. Nov. 21, 2013) (quoting *Nogueda v. Granite Masters, Inc.*, No. 09-cv-374, 2010 WL 1521296, at *2 (N.D. Ind. Apr. 14, 2010)).  In this action, the parties stipulated to the conditional certification of a collective class.  (Filing No. 80, at p. 3).  The court implicitly approved the conditional certification by an Order dated February 25, 2015. (Filing No. 90 at p. 1; *see also supra* n.1).

This case, then, is in the second stage, which occurs after the parties have engaged in discovery and the opt-in process is complete. *See Hundt*, 294 F.R.D. at 104.  In this stage, the court has "the opportunity to determine whether the class should be decertified or restricted because putative class members are not in fact similarly situated as required by the statute." *Streeter-Dougan*, 2013 WL 6174936, at *1 (citation omitted).  Under this more stringent inquiry, the court generally considers three factors: (1) whether plaintiffs share similar or disparate factual and employment settings; (2) whether the various affirmative defenses available to the defendant would have to be individually applied to each plaintiff; and (3) fairness and procedural concerns. *See Threatt v. CRF First Choice, Inc.*, No. 1:05-cv-117, 2006 WL 2054372, at *5 (N.D. Ind. July 21, 2006).  The plaintiffs bear the burden of showing that they are similarly situated. *See Hundt*, 294 F.R.D. at 104 (citing *Camilotes v. Resurrection Health Care Corp.*, 286 F.R.D. 339, 345 (N.D. Ill. 2012)).

### III.  Discussion

Smith argues that Branch Administrators were subject to a common policy because all Branch Administrators were paid less than $455 per week, required to work over 40 hours, and not paid overtime.  (Filing No. 220 at p. 2).  It is unclear, though, whether Smith is arguing that the alleged violation is a mischaracterization of the Branch Administrator role as non-exempt; or that the alleged violation is the failure to pay for hours worked, including any overtime; or some hybrid that fits in neither category. Under any analysis, the court concludes that decertification of the conditional, collective class is appropriate because Smith has not demonstrated that she is similarly situated to all opt-in Branch Administrators who were subject to a common policy that violated the FLSA.

### A.  Mischaracterization of the Branch Administrator Role as Non-Exempt

Smith's allegations may be read to claim that PTI improperly classified her and the Opt-In Plaintiffs as non-exempt, when they should have been classified as exempt and paid at least $455.00 per week.  (Filing No. 220 at pp. 2 & 28-29).  However, Smith points to no statute, regulation, or case law that requires an employer to classify employees as exempt because they perform some amount of managerial work.  The statutes and regulations instead require that employees who are classified as non-exempt be paid for all hours that they work at a minimum rate, and compensated for overtime

work.  *See* 29 U.S.C. §§ 206, 207 & 213; 29 C.F.R. §§ 541.100-.200, 778.107-.110, 778.201.[6]  Therefore, the court declines to certify a collective class action on this ground.

### B.  Failure to Pay for Hours Worked and Failure to Pay Overtime

With respect to Smith's theory that PTI had an unwritten policy that required Branch Administrators to work more than their authorized hours, but not pay them for those hours, regardless of whether they were regular time or overtime, individualized issues predominate over common ones.  A simple comparison of the testimony provided by Smith and Coffey evidences the problem.  Smith testified that she was told that Coffey was fired because he reported more than his authorized hours of Branch Administrator work.  (Filing No. 210-6, Smith Dep. at pp. 41, 51, 66-67).  She also stated that Ashburn discouraged her from reporting more than the 22 hours of administrative work authorized in her BA Agreement.  (*Id.* at p. 15).  As a result, Smith never reported any hours of administrative time over the 22 authorized hours in her BA Agreement, even though she claims that she performed nearly 40 hours of Branch Administrator work each week.  (*Id.* at pp. 40-41, 86; Filing No. 220-60, Smith Decl. ¶ 7).

In contrast, Coffey testified that he submitted, and was paid for, administrative time over the authorized hours in his BA Agreement for some period of time.  (Filing No. 217 at pp. 22-23; Filing No. 220 at p. 15).  There was some administrative time that Coffey submitted to Ashburn for which he did not get paid, but Coffey suspected it was

---

[6] Amendments to 29 C.F.R. §§ 541.100-.200 were scheduled to become effective on December 1, 2016, but were held invalid and implementation stayed by *Nevada v. United States Department of Labor*, ___ F. Supp. 3d ___ 2017 WL 3837230 (E.D. Tex. Aug. 31, 2017), *appeal pending*; however, the amendments do not affect the analysis in this case.

because Ashburn failed to turn it in, not because PTI would not pay it.  (Filing No. 217 at p. 25).  Coffey claims that he stopped reporting extra Branch Administrator time after a conversation with Barr, who implied that Coffey was either inefficient or falsifying his time.  (Filing No. 217 at pp. 24-26; Filing No. 220 at p. 15).  PTI's payroll records reflect that there were at least six weeks during which Coffey reported and was paid for excess Branch Administrator hours.  In at least two of those weeks, the number of excess hours alone exceeded 40 hours.  (Filing No. 220 at p. 15).  Although PTI claims that it fired Coffey for speeding, he believes it was in retaliation for submitting excess hours.  (Filing No. 217 at p. 26).

Even though Smith and Coffey had similar BA Agreements for the same territory, there is no common policy from which a jury or the court could determine that PTI violated the FLSA.  Although each of them say that they worked more Branch Administrator hours than were authorized in their BA Agreements and that they were not paid for additional time, those statements alone do not constitute a PTI policy.  The evidence supports that PTI's policy was to pay Branch Administrators for all excess administrative time for which they sought payment, even if the time was not pre-approved.  While Smith voluntarily never reported hours she claims to have worked, Coffey was paid for a large number of excess hours for at least six weeks and claims that he stopped submitting additional excess hours because of pressure from Barr.  On this alone, the evidence shows that some Branch Administrators were paid for excess hours they reported.  Any anecdotal evidence to the contrary from Smith or Coffey that relates to their own situation does not show a common policy or practice.

22

The other circumstances surrounding Smith's and Coffey's employment history with PTI, as well as the other Opt-In Plaintiffs' experiences, confirms that individualized issues predominate over any common policy or practice.  Smith was never paid for hours she never reported because she felt threatened by Ashburn.  Determining the truth of any of these propositions is highly fact intensive and would turn on the credibility of the witnesses.  The same is true with Coffey who admits he was paid for some hours he reported, but claims he (1) was not paid for other hours he reported (presumably because Ashburn never turned the hours into payroll); (2) never reported other hours he claimed he worked because he felt threatened by Barr; and (3) was fired in retaliation for reporting excess hours.  Again, any one of these propositions involves a highly fact sensitive inquiry that would likely turn on credibility.

The information from the other Opt-In Plaintiffs, whose Branch Administrator responsibilities and BA Agreements were different from those of Smith's and Coffey's only underscore the individualized nature of the inquiry here.  The Opt-In Plaintiff's BA Agreements vary not only in the number of administrative hours they authorize, but also in the compensation they received for those hours.  (Filing No. 210-2, Baum Decl. ¶¶ 33, 39-42).  Therefore, determining whether any given Opt-In Plaintiff worked extra hours, and how many of those excess hours went uncompensated, is highly fact sensitive.  These inquiries are at the core of whether or not there is a violation, which cautions against collective treatment.

Moreover, Smith's suggestion of how class-wide damages could be proven at trial merely supports a conclusion that individualized issues predominate.  Smith proposes that

23

each Opt-In Plaintiff would submit a declaration identifying the total number of hours they worked on average in a week.  Smith states, "These sworn statements will then become the number of hours on a weekly basis that class members worked as [Branch Administrators]."  (Filing No. 220 at p. 32).  But, this plan presupposes that PTI knew that each Opt-In Plaintiff worked more hours than he or she reported and agrees that they all worked excess hours.  In other words, it establishes liability without putting the plaintiff to his or her proof.  The potential number of hours that each Opt-In Plaintiff presumably worked and that PTI allegedly failed to compensate cannot be determined on a class-wide basis; rather, it is an individualized inquiry that in large part turns on credibility.  Further, to allow the fact to become established on the word of one party is unfair.

Under the circumstances presented here, the court is left with the firm impression that factual differences predominate over any common ones, and that Smith's proposed method for determining damages would prejudice PTI.  For these reasons, PTI's motion to decertify this collective action is **GRANTED**.

## IV.  Conclusion

For the reasons stated herein, the court **GRANTS** Defendant Professional

Transportation, Inc.'s, Motion to Decertify Collective Action (Filing No. 209).

**SO ORDERED** this 26th day of January 2018**.**

RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana

Distributed Electronically to Registered Counsel of Record.